UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL SAPIA; CHRISTIAN PELLOT; NEFTALI PELLOT;
RAYNIER DELGADILLO; JOHN CARUSI; COLETTE SAJJAD;
PRIAMO FERMIN; ROBERT TRACEY; ALEXANDER
CAMPBELL; DEVON BAILEY; ANDREA BARNES; ALAN
BENNETT; ANTHONY BIRKBECK;  WINSTON
BLACKWOOD; KENDAL BRAZEL; ERROL BROWN;
DIONICIO CHAMBERS; RAVI DHANASAR; FREDERICK
DIAZ; RAFAEL DIAZ; HOWARD HARRISON; SHERIBA
JACKSON; MIGUEL A. MOREL; GARNETT MORGAN; ALI
MUHAMMED; GARY PHIFER; HAMEEN RASULLAH;
CLINTON SPENCE; VINCENT TAYLOR; and SHAMARL
WILSON,

                     Plaintiffs,

     v.

HOME BOX OFFICE, INC.

                 Defendant.

Civil Action No.:  19-cv-3142

**COMPLAINT**

**JURY TRIAL
DEMANDED**

       Plaintiffs MICHAEL SAPIA ("Sapia"); CHRISTIAN PELLOT ("C. Pellot"); NEFTALI

PELLOT ("N. Pellot"); RAYNIER DELGADILLO ("Delgadillo"); JOHN CARUSI ("Carusi");

COLETTE SAJJAD ("Sajjad"); PRIAMO FERMIN ("Fermin"); ROBERT TRACEY ("Tracey");

ALEXANDER CAMPBELL ("Campbell"); DEVON BAILEY ("Bailey"); ANDREA BARNES

("Barnes"); ALAN BENNETT ("Bennett"); ANTHONY BIRKBECK ("Birckbeck"); WINSTON

BLACKWOOD ("Blackwood"); KENDAL BRAZEL ("Brazel"); ERROL BROWN ("Brown");

DIONICIO CHAMBERS ("Chambers"); RAVI DHANASAR ("Dhanasar");  FREDERICK DIAZ

("F. Diaz"); RAFAEL DIAZ ("R. Diaz"); HOWARD HARRISON ("Harrison"); SHERIBA

JACKSON ("Jackson"); MIGUEL A. MOREL ("Morel"); GARNETT MORGAN ("Morgan");

ALI  MUHAMMED  ("Muhammed");  GARY  PHIFER  ("Phifer");  HAMEEN  RASULLAH

("Rasullah"); CLINTON SPENCE ("Spence"); VINCENT TAYLOR ("Taylor"); and SHAMARL

WILSON ("Wilson") (collectively, "Plaintiffs") by and through their attorneys, VALLI KANE & VAGNINI LLP, bring this action for damages and other legal and equitable relief from Defendant HOME BOX OFFICE, INC. ("Defendant") for violations of the Fair Labor Standards Act ("FLSA"), as amended, 29 U.S.C. §§ 201 *et seq.*, the New York Labor Law ("NYLL"), and any other cause(s) of action that can be inferred from the facts set forth herein.

## INTRODUCTION

1.      This is an action brought by Plaintiffs challenging acts, committed by Defendant against Plaintiffs, which amounted to violations of federal and state wage and hour laws.

2.      Defendant employed Plaintiffs as Parking Production Assistants ("PPAs"). PPAs' job duties included reserving parking spots, using their personal vehicles, for Defendant's television and/or movie production scenes and production vehicles.

3.      Plaintiffs were named plaintiffs, putative class members, and/or opt-ins in a series of twelve (12) NYLL and FLSA class and collective actions filed in the Southern District of New York. These cases challenged the pay practices of virtually all of the major film and television networks who utilize PPAs in connection with productions set in the New York metropolitan area. One of these lawsuits was brought against Defendant and was styled *Fermin, et al. v. Home Box Office Inc., et al.*, 15-cv-07941 (AT)(JCF) (S.D.N.Y. 2015) (the "Lawsuit"). The Lawsuit alleged that Defendant violated the NYLL and/or FLSA by, among other things, failing to compensate PPAs with an overtime premium for all hours worked in excess of forty (40) hours per workweek.

4.      Following the commencement of the Lawsuit, Defendant retaliated against Plaintiffs for engaging in protected activity by implementing a policy and practice of reducing Plaintiffs' shifts, terminating Plaintiffs' employment, and/or refusing to hire Plaintiffs' as PPAs. These retaliatory actions by Defendant resulted in the significant loss of income to each Plaintiff,

many of whom worked years with Defendant earning steady and significant income compared to the time frame after which they engaged in protected activity.

5.     Plaintiffs are entitled to recover: (i) back pay, (ii) benefits, (iii) liquidated damages, (iv) interest, (v) reinstatement, and (vi) attorney fees and costs pursuant to the FLSA and the NYLL, along with such other and further relief as this Court finds necessary and proper.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court for actions arising under the laws of the United States, and pursuant to 28 U.S.C. §§ 1343(3) and 1343(4), which confer original jurisdiction upon this Court in a civil action to recover damages or to secure equitable relief (i) under any Act of Congress providing for the protection of civil rights; (ii) under the Declaratory Judgment Statute, 28 U.S.C. § 2201; and (iii) under 29 U.S.C. §§ 201 *et seq*.

7.     The Court's supplemental jurisdiction is invoked to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction over all non-federal claims arising from a common nucleus of operative facts such that they form part of the same case or controversy under Article III of the United States Constitution.

8.     Venue is proper in this Court pursuant to 29 U.S.C. §§ 201 *et seq*., because this judicial district lies within a state in which the unlawful employment practices occurred. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (c), because Defendant maintains facilities, conducts business and resides in this district.

**THE PARTIES**

9.     At all relevant times, each and every one of the following Plaintiffs was an "employee" within the meaning of the FLSA and the NYLL and was employed by Defendant within this judicial district:

a)   Michael Sapia
b)   Christian Pellot
c)   Neftali Pellot
d)   Raynier Delgadillo
e)   John Carusi
f)   Colette Sajjad
g)   Priamo Fermin
h)   Robert Tracey
i)   Alexander Campbell
j)   Devon Bailey
k)   Andrea Barnes
l)   Alan Bennett
m)   Anthony Birkbeck
n)   Winston Blackwood
o)   Kendal Brazel
p)   Errol Brown
q)   Dionicio Chambers
r)   Ravi Dhanasar
s)   Frederick Diaz
t)   Rafael Diaz
u)   Howard Harrison
v)   Sheriba Jackson
w)   Miguel Morel
x)   Garnett Morgan
y)   Ali Muhammad
z)   Gary Phifer
aa)   Hameen Rasullah
bb)   Clinton Spence
cc)   Vincent Taylor
dd)   Shamarl Wilson

10.     Upon information and belief, Defendant is organized under the laws of the state of Delaware and has its principal place of business in New York, New York.

11.     Defendant transacted and continues to transact business in New York by employing persons as PPAs and by filming television and movie productions within the state of New York.

4

12.     Defendant has at all relevant times been an "employer" covered by the FLSA and the NYLL.

13.     Upon information and belief, the amount of qualifying annual volume of business for Defendant exceeds $500,000.00 and thus subjects Defendant to the FLSA.

14.     Upon information and belief, Defendant is engaged in interstate commerce.  This independently subjects Defendant to the FLSA.

15.     Defendant employed Plaintiffs as a joint employer and/or single integrated enterprise along with the production companies associated with each of the film and television productions on which Plaintiffs worked as PPAs.

## STATEMENT OF THE FACTS

### I.     Facts Common to All Plaintiffs

#### a)     Facts Pertaining to Plaintiffs' Employment

16.     Defendant's business consists of, among other things, producing films and television series.

17.     Development and production of a film or television series requires the coordinated efforts of numerous people, including writers, directors, actors, editors, camera crew, sound crew, lighting crew, producers, production coordinators (including parking production coordinators and the parking production supervisors who report to the coordinators), supervisors, accountants, paymasters, and the cornucopia of other jobs that are typically reflected on the credit reels included at the end of each film or television production.

18.     At or near the bottom of the "totem pole" are the PPAs, who report to Defendant's Parking Coordinators.  PPAs are responsible for showing up in advance of filming on location or on set to secure the parking spaces required for all of the production vehicles and trailers.  PPAs

are also responsible for safeguarding production equipment (e.g. cameras, sound and lighting equipment) over the course of however many days it takes to complete the filming of each project.

19.     The nature of PPAs' work is that it is only available for relatively short durations at a time, during the days in which a production is "on location."  However, they will typically be called back to work on sequels or subsequent seasons of a film or television series that is popular and/or profitable.  Once filming of a project they are working on is completed, PPAs generally move on to the next production that is being filmed.  As a practical matter, this means they are continually rotating from one production to the next, and tend to be employed by multiple productions, working to secure locations for one project while another is between shoots, or working on productions sequentially as they become available.  This also means that PPAs tend to work for multiple employers over the course of any given period of time.  During the relevant period, PPAs were generally employed on multiple productions, simultaneously and/or consecutively, for multiple employers, including Defendant.

20.     Plaintiffs' job duties were integral to Defendant's productions because without reserved parking spots and streets void of unauthorized vehicles, Defendant's production equipment would have nowhere to park and/or productions would be hindered due to unauthorized vehicles being parked on location.

21.     Defendant's productions could not have been completed without Plaintiffs and other PPAs to secure the locations and equipment necessary to produce Defendant's films and television series.

### 1. Production of Film and Television Series

22.     Prior to the development of films or television series, writers generally pitch their concepts and/or scripts to Defendant.  When Defendant identifies films or series it expects will be commercially successful, Defendant contracts with the writers to develop and produce the projects.

23.     Defendant creates its films and television content through the use of different production company entities associated with each of their particular film and television productions.  Defendant generally creates its media content under the brand name or label of one or more production company entities, which typically have unique, creative and memorable entity names, over which they exercise dominion and control.

24.     Defendant provides the financing and/or financial support necessary to ensure that its production companies are able to create its film and television productions.

25.     Plaintiffs were employed by Defendant as PPAs, through its own production company subsidiaries and/or through third party production companies over which it exercised dominion and control.  Defendant employed Plaintiffs on many different film and television productions, simultaneously and/or consecutively.

### 2. Defendant's Control and Dominion over Plaintiffs' Employment

26.     Despite being assigned to perform work for numerous production companies owned or controlled by Defendant, the terms and conditions of Plaintiffs' employment did not change from one production to the next, even when the production companies associated with the films or television series Plaintiffs were working on were different.  In other words, the terms and conditions of Plaintiffs' employment was the same at all of the production companies owned and/or controlled by Defendant.

27.    For example, before commencing employment in connection with each film or television production, Plaintiffs were required to execute "start form" documentation—a packet containing, among other documents, an I-9 form, W-4 form, non-disclosure agreement, and emergency contact form.  Each production company issued the same packet to Plaintiffs prior to the commencement of their employment.   All of the production companies' start form documentation contained forms which included Defendant's name, which was pre-printed on the form.

28.    Plaintiffs were required to use Defendant's identification badges while working on any of Defendant's production sets.  No matter what production Plaintiffs were working on, the identification badges consistently displayed "HBO"—Defendant's unmistakable logo.

29.    Plaintiffs, in connection with their employment, were given clothing emblazoned with the "HBO" logo at the end or "wrap" of each production.

30.    Defendant employed Parking Coordinators who were responsible for overseeing the PPAs and the PPAs' supervisors.  Defendant's Parking Coordinators were employed by Defendant and held themselves out as employed by Defendant.  For example, one of Defendant's Parking Coordinators, Maurice Cabrera ("Mr. Cabrera") displayed on his "LinkedIn page" that he was a parking coordinator for "HBO."

31.    Defendant and its production companies list the same address on their corporate documentation—1100 Avenue of the Americas 6-18, New York, NY 10036

32.    Defendant and its production companies jointly issued Plaintiffs' paychecks from Defendant's address at 2500 Broadway #400, Santa Monica, California 90404.

33.    Defendant used third party payroll companies to pay Plaintiffs and other PPAs. Defendant had these payroll companies list their own (the payroll companies') subsidiaries in the

"employer" section of the W-2 form, despite the fact that the PPAs were never employed by the payroll companies and that Defendant's contracts with the payroll companies provide that the payroll companies are not the actual employers of the persons being paid (*i.e.*, the PPAs).

34.     Defendant provided the payroll company with all the necessary hiring and employment records for the Plaintiffs including, but not limited to: W-2 employment forms, W-4 employment forms, pay rate acknowledgement forms, wage verification forms, conflict of interest questionnaires, direct deposit forms, and employment verification forms. Defendant also provided the final pay information for each Plaintiff to the payroll company that issued paychecks to Plaintiffs on a weekly basis.

35.     Plaintiffs' W-2s "employee earnings summary" state that Plaintiffs were paid "wages" in connection with their work on "HBO" television series and films.

36.     Plaintiffs' paychecks state that Plaintiffs were paid wages for their work on "HBO" film and television productions.

37.     Defendant deducts from its taxes the expenses associated with its production of the film and television productions for which it utilizes Plaintiffs as PPAs.  Upon information and belief, these deductions include the expenses associated with Plaintiffs' wages.

38.     Upon information and belief, Defendant maintained Plaintiffs' employment records or compelled third-parties, over whom it exercises dominion and control, to do so.

39.     Upon information and belief, Defendant sets the budget for each of its film and television productions, which delineated as part of the budget Plaintiffs' rate of pay.

40.     Upon information and belief, Defendant determined the manner and frequency of Plaintiffs' pay.

41. Defendant employed and used its own location scouts to identify filming locations for the productions produced by Defendant's purportedly "independent" production companies.

42. A July 29, 2014 news article from the Poughkeepsie Journal specifically cites to "HBO scouts" and "HBO Staff" searching for a filming location for the television show *Girls*.

43. Based upon the preceding paragraph, upon information and belief, the location scouts were employed by Defendant and not by the production company.

44. The July 29, 2014 news article form the Poughkeepsie Journal also states that "HBO" brought its own actors to film for the production *Girls*

45. Defendant, via local police departments, restricted parking in the areas surrounding its production locations and issued parking restriction notices to the area residents which identified "HBO" as the party responsible for the filming.

46. For example, on September 28, 2016, the Hastings-on-Hudson police department issued a parking restriction notice for Defendant expressly referencing "HBO" and its television show *Girls*, which stated: "Parking Restrictions in Hastings Downtown area for Tuesday, August 2nd, due to HBO filming the television series 'Girls.'"  Similarly, on May 1, 2017, the Hastings-on-Hudson police department issued another parking restriction notice expressly referencing "HBO" and its television show *Divorce*, which stated: "On Monday, May 15, 2017, HBO will be in our village filming for an episode of *Divorce*. The following Parking restrictions / Road closures will be in effect."

47. Defendant maintained and managed all labor relations with Plaintiffs and other PPAs.

48.     Defendant negotiates labor relations, in its capacity as an employer, with the collective bargaining unit that represents PPAs, including Plaintiffs—Communications Workers of America, Local 1101.

49.     For example, the National Labor Relation Board, case number 02-0RC-212029 lists Defendant as Plaintiffs' and other PPAs' employer.

50.     Defendant is a party to collective bargaining agreements with other unions whose members are employed on the same productions sets as Plaintiffs, including the Teamsters.

51.     Defendant settled the Lawsuit with Plaintiffs and other PPAs, obtaining releases on behalf of Broken Records, LLC, Half A Yogurt, LLC, Home Box Office, Inc. (the "HBO Defendants.") and numerous other unnamed production companies.

52.     Defendant was the sole signatory to the Lawsuit settlement agreement (the "Settlement Agreement") on behalf of the HBO Defendants and at the time the Settlement Agreement was executed, Defendant was no longer a party to the Lawsuit due to being voluntarily dismissed from the action.

53.     Even though dismissed, Defendant agreed in the Settlement Agreement that settlement consideration would be paid into a fund from which Plaintiffs would be compensated.

54.     Upon information and belief, Defendant agreed that settlement consideration would be paid because Defendant was obligated to accept financial responsibility for any liability incurred in connection with the film and television productions created through its purportedly "independent" production companies. Upon information and belief, the only reason why Defendant was required to indemnify the production companies was because those production companies were contractually required to follow Defendant's policies and procedures with respect to hiring and compensating Plaintiffs and other PPAs.

55.     Furthermore, in the Settlement Agreement Defendant agreed that 50% of the settlement consideration was "wages."

### 3.  The Hiring Process

56.     Defendant did not post job openings for vacant PPA positions.

57.     Instead, Defendant hired PPAs exclusively through its Parking Coordinators, without a formal hiring process.

58.     Once Parking Coordinators were tapped for a particular production or productions, they were responsible for procuring a team of PPAs to cover the production.  Many Coordinators worked with the same teams of PPAs for years and across multiple productions.

59.     Defendant's Parking Coordinators would begin the PPA hiring process via word of mouth and referrals from PPAs already employed by Defendant.

60.     The informal hiring process was conducted via telephone or text message with the Parking Coordinator first reaching out to PPAs to offer them employment.

61.     However, Parking Coordinators had broad discretion on what PPAs to hire and to retain.

62.     Certain Parking Coordinators also worked for numerous competitor production companies either at the same or different times they worked for Defendant.

63.     Once hired by Defendant's Parking Coordinator, Plaintiffs were assigned to productions.

64.     Plaintiffs were assigned to productions by their Parking Coordinators primarily through text messages and secondarily through telephone calls.

65.     Once assigned to a production, the Parking Coordinator and/or their PPA Supervisors contacted Plaintiffs to assign them their weekly work schedule.

66.     If Plaintiffs were not contacted by the Parking Coordinator for production assignments/shifts to work, Plaintiffs contacted their Parking Coordinator and/or PPA Supervisors to request assignment.

67.     Parking Coordinators then decided whether to assign Plaintiffs to work shifts, if available, for a particular production.

68.      If not contacted by a Parking Coordinator or PPA Supervisor, Plaintiffs requested production assignments/shifts to work from their Parking Coordinator and/or PPA Supervisor.

69.     Once a PPA was hired by Defendant they were used for subsequent productions as Defendant rarely hired new (or replaced current) PPAs.

70.     Once a production ended, Plaintiffs were generally contacted by their Parking Coordinator for assignment on Defendant's next production.

71.     Many of the PPAs engaged by Defendant through their Parking Coordinator, had a long work history in the industry and had worked on several productions for Defendant prior to the lawsuits filed by PPAs regarding their wages.

### 4.  Job Duties

72.     As PPAs, Plaintiffs' job duties primarily consisted of using their personal vehicles to reserve parking spots and sometimes entire city blocks for Defendant's production vehicles and equipment.

73.     Plaintiffs were often required to remain in their vehicles at a reserved parking spot location for up to twenty-four to forty-eight hours at a time.

74.     PPAs generally worked twelve (12) hour shifts and were paid on a per shift basis.

75.    Plaintiffs were supervised by Parking Coordinators.

76.    Defendant also employed PPA Supervisors to assist Parking Coordinators in supervising PPAs.

77.    PPA Supervisors reported directly to Parking Coordinators and PPAs reported to both the PPA Supervisors and the Parking Coordinators.

78.    Parking Coordinators and PPA Supervisors reported to Defendant, and were employees of Defendant.

79.    Defendant, through its Parking Coordinators and/or PPA Supervisors, assigned Plaintiffs their work schedules.

80.    Defendant communicated the work schedules to Plaintiffs through the Parking Coordinators via telephone and/or text messaging.

### b)    Facts Pertaining to Retaliation

81.    On October 8, 2015, a collective action—*Fermin*, *et al. v. Home Box Office Inc.*, *et al.*, 15-cv-07941 (AT)(JCF) (S.D.N.Y. 2015)—was commenced against Defendant in the Southern District of New York asserting violations of the FLSA, analogous provisions of the New York Labor Law, and the Wage Theft Prevention Act.

82.    Also in or around October 2015, Plaintiffs and other PPAs participated in other FLSA collective actions and Fed. R. Civ. P 23 NYLL class actions against a number of other production companies alleging violations similar to those alleged in the Lawsuit. These actions include, without limitation: *Hines, et al. v. CBS Corporation et al.*, 14-cv-078882 (PGG) (S.D.N.Y. 2015) ("*Hines*"); *Leach, et al. v. Warner Brothers Inc., et al.*, 15-cv-07208 (AT)(JCF) (S.D.N.Y 2015); and *Morgan, et al. v. Warner Bros. Pictures, a division of WB Studio Enterprises Inc., et al.*, 16-cv-01411 (JCF) (S.D.N.Y 2016) (collectively, the "PPA Lawsuits").

83.     The violations asserted in the Lawsuit and the PPA Lawsuits included, among

others things, Defendant's willful failure to pay PPAs an overtime premium for all hours worked

in excess of forty (40) hours per workweek.

84.     All of the PPA Lawsuits, including the Lawsuit settled for millions of dollars.

However, during the pendency of the PPA Lawsuits, including the Lawsuit, Defendant

immediately engaged in a systematic retaliation scheme against PPAs who participated in the

Lawsuit or PPA Lawsuits as either named or opt-in plaintiffs.

85.     After the Lawsuit was filed in the Southern District of New York, Defendant began

an inquisition into Plaintiffs' participation in the Lawsuit.

86.     For example, Defendant compiled a list of all PPAs who were named and opt-in

plaintiffs in the Lawsuit and the PPA Lawsuits. Furthermore, as PPAs opted-in to the Lawsuit and

the PPA Lawsuits they were added to Defendant's list.

87.     Defendant learned of Plaintiffs' participation in the Lawsuit from various sources,

including directly asking Plaintiffs and other PPAs if they participated in the Lawsuit or knew who

did. For example, Defendant's Parking Coordinators and PPA Supervisors spoke to Plaintiffs

directly to ask them if they were "involved" in the Lawsuit.

88.     Defendant also had knowledge of Plaintiffs' participation in the Lawsuit from the

Court's Case Management/Electronic Case Files website which listed Plaintiffs' names as either

parties to the Lawsuit or as opt-in plaintiffs.

89.     Additionally, following the filing of the Lawsuit and the PPA Lawsuits, the New

York Times published an article that was comprised of interviews of Plaintiff Campbell, C. Pellot,

and Tracey regarding other PPA Lawsuits against other major production companies. The article

also featured clear photos of Plaintiff Campbell and Plaintiff Tracey beneath the bright lights of

the Ziegfeld Theater. Accordingly, Defendant had knowledge of Plaintiffs Campbell's, C. Pellot's, and Tracey's participation in the Lawsuit from this New York Times' article.

90.     Defendant retaliated against certain Plaintiffs by reducing the number of shifts they were assigned each workweek and, with respect to other Plaintiffs, by refusing to employ or re-employ them throughout 2016 and after October 1, 2016 until present.

91.     Once Defendant learned that Plaintiffs participated in the Lawsuit, certain Plaintiffs' weekly allotted shifts were reduced from approximately five (5) shifts per workweek to approximately two (2) or fewer shifts per workweek. Other Plaintiffs were denied re-employment as a PPAs when they sought work throughout 2016 and after October 1, 2016 until present.  This reduction in shifts/refusal to hire was not related to any decrease in Defendant's labor needs, or any decline in production activity.

92.     Defendant reduced Plaintiffs' shifts to strategically force Plaintiffs to resign by reducing their pay to levels below those necessary to sustain themselves and their dependents.

93.     Defendant hired new PPAs, who were not involved in the Lawsuit, to replace Plaintiffs.

94.     Although Plaintiffs were routinely hired by Defendant as PPAs, their requests for work before and after October 1, 2016, were ignored or expressly denied by Defendant in retaliation for their participation in the Lawsuit.

95.     Throughout the relevant time period, Defendant engaged in film and television productions, which required the employment of PPAs, within the tristate area.

96.     Accordingly, there were available PPA positions for these film and television productions.

97.     It is common practice in the production industry for different production companies to employ the same Parking Coordinators that their competitors employ. As a result of employing the same Parking Coordinators the unlawful retaliatory practices of certain influential Parking Coordinators spread through this niche industry. It became common practice in the industry to freeze out PPAs who participate in litigation against their employers by denying them work in retaliation for their protected activity.

98.     Defendant's informal hiring process resulting in Parking Coordinators' broad discretion to hire and fire PPAs permitted such rampant retaliation.

## II.     Facts Specific to Plaintiff Sapia

99.     Plaintiff Sapia has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

100.    Plaintiff Sapia was formerly employed by Defendant as a PPA and as a PPA Supervisor.

101.    While employed by Defendant, Plaintiff Sapia was consistently assigned (5) or more shifts per workweek.

102.    On or around February 10, 2016, Plaintiff Sapia opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

103.    Defendant had actual knowledge that Plaintiff Sapia opted-in to the Lawsuit.

104.    After Defendant learned that Plaintiff Sapia opted-in to the Lawsuit, Defendant ceased assigning him shifts of work and he was terminated in retaliation for opting-in to the Lawsuit.

105.    In or around April 2016, Defendant summoned Plaintiff Sapia to a meeting.

106.    At that meeting, one of Defendant's Parking Coordinators, Mr. Cabrera, stated that PPAs who participated in the Lawsuit and PPA Lawsuits were to receive less shifts to force their resignation.

107.    He also stated the Lawsuit and the PPA Lawsuits were "getting out of hand."

108.    Mr. Cabrera then stated to Plaintiff Sapia that he was required to remove himself from the Lawsuit and the other PPA Lawsuits in order to continue working as a PPA.

109.    Around the conclusion of the meeting, Mr. Cabrera presented Plaintiff Sapia with a "Working Agreement" to sign.

110.    The Working Agreement required Plaintiff Sapia to remove himself from the Lawsuit and PPA Lawsuits and to cease discussions about it with other PPAs.

111.    Plaintiff Sapia refused to execute the Working Agreement and tore it up in front of Mr. Cabrera.

112.    Subsequently, Defendant ceased assigning shifts to Plaintiff Sapia.

113.    On numerous occasions throughout 2016 and after October 1, 2016, Plaintiff Sapia was refused continued employment.  Furthermore, at various times from 2016 to the present, Plaintiff Sapia sought employment as a PPA through Defendant's informal hiring process, but these requests were expressly denied or were ignored.

114.    Prior to opting-in to the Lawsuit, Plaintiff Sapia was routinely hired as a PPA for Defendant's productions.

115.    Accordingly, Defendant refused to hire Plaintiff Sapia in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

### III.    Facts Specific to Plaintiff C. Pellot

116.    Plaintiff C. Pellot has at all relevant times been an employee pursuant to the FLSA and the NYLL.

117.    Plaintiff C. Pellot was formerly employed by Defendant as a PPA.

118.    While employed by Defendant, Plaintiff C. Pellot was consistently assigned (5) or more shifts per workweek.

119.    Plaintiff C. Pellot was a named plaintiff in the Lawsuit.

120.    Plaintiff C. Pellot filed the Lawsuit on October 8, 2015.

121.    Defendant had actual knowledge that Plaintiff C. Pellot commenced the Lawsuit.

122.    After Defendant learned that Plaintiff C. Pellot commenced the Lawsuit, Defendant ceased assigning him shifts of work and he was terminated in retaliation for filing the Lawsuit.

123.    Mr. Cabrera informed Plaintiff C. Pellot that he would no longer be given shifts and was terminated for his participation in the Lawsuit and PPA Lawsuits.

124.    Plaintiff C. Pellot asked Defendant to assign him shifts to work, but these requests were denied expressly or were ignored.

125.    When Plaintiff C. Pellot asked for work, Mr. Cabrera required Plaintiff C. Pellot to sign a "Working Agreement" in order to return to work for Defendant. The Working Agreement prevented Plaintiff C. Pellot from, among other things, complaining about the amount of shifts he was received and/or comparing the amount of shifts he received to other PPAs. The Working Agreement thus violated Plaintiff C. Pellot's rights under the FLSA and other federal law laws.

126.    Plaintiff C. Pellot refused to sign the Working Agreement and accordingly he was not assigned any shifts to work in retaliation for filing the Lawsuit.

127.    On, numerous occasions throughout 2016 and after October 1, 2016, Plaintiff C. Pellot was refused continued employment. Furthermore, Plaintiff C. Pellot sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

128.    Prior to filing the Lawsuit, Plaintiff C. Pellot was routinely hired as a PPA for Defendant's productions.

129.    Accordingly, Defendant failed to hire Plaintiff C. Pellot in retaliation for filing the Lawsuit in violation of the FLSA and NYLL.

**IV.    Facts Specific to Plaintiff N. Pellot**

130.    Plaintiff N. Pellot has at all relevant times been an employee pursuant to the FLSA and the NYLL.

131.    Plaintiff N. Pellot was formerly employed by Defendant as a PPA.

132.    While employed by Defendant, Plaintiff N. Pellot was consistently assigned (5) or more shifts per workweek.

133.    On or around November 11, 2015, Plaintiff N. Pellot opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

134.    Defendant had actual knowledge that Plaintiff N. Pellot opted-in to the Lawsuit.

135.    After Defendant learned that Plaintiff N. Pellot opted-in to the Lawsuit, Mr. Cabrera telephoned Plaintiff N. Pellot and stated to him: "I can't give you no more work" and "what do you think you're going to get by [by joining the Lawsuit]?" He also demanded that Plaintiff N. Pellot opt-out of the Lawsuit and the PPA Lawsuits, but Plaintiff N. Pellot refused.

136.     After Plaintiff N. Pellot refused to opt-out of the Lawsuit and the PPA Lawsuits, Defendant ceased assigning him shifts of work and he was terminated in retaliation for opting-in to the Lawsuit.

137.     On numerous occasions in 2016 and after October 1, 2016, Plaintiff N. Pellot was refused employment. Furthermore, Plaintiff N. Pellot sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

138.     Prior to opting-in to the Lawsuit, Plaintiff N. Pellot was routinely hired as a PPA for Defendant's productions.

139.     Accordingly, Defendant refused to hire Plaintiff N. Pellot in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**V.     Facts Specific to Plaintiff Delgadillo**

140.     Plaintiff Delgadillo has at all relevant times been an employee pursuant to the FLSA and the NYLL.

141.     Plaintiff Delgadillo was formerly employed by Defendant as a PPA.

142.     While employed by Defendant, Plaintiff Delgadillo was consistently assigned (5) or more shifts per workweek.

143.     On or around October 30, 2015, Plaintiff Delgadillo opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

144.     Defendant had actual knowledge that Plaintiff Delgadillo opted-in to the Lawsuit.

145.     Subsequently, Mr. Cabrera stated to Plaintiff Delgadillo that he "messed up" by opting-in to the Lawsuit and the PPA Lawsuits.

146.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Delgadillo any shifts to work in retaliation for opting-in to the Lawsuit.

147.    On numerous occasions before and after October 1, 2016, Plaintiff Delgadillo sought employment as a PPA through Defendant's informal hiring process, but these requests were expressly denied or were ignored.

148.    Prior to opting-in to the Lawsuit, Plaintiff Delgadillo was routinely hired as a PPA for Defendant's productions.

149.    Accordingly, Defendant refused to hire Plaintiff Delgadillo in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

### VI.    Facts Specific to Plaintiff Carusi

150.    Plaintiff Carusi has at all relevant times been an employee pursuant to the FLSA and the NYLL.

151.    Plaintiff Carusi was formerly employed by Defendant as a PPA.

152.    While employed by Defendant, Plaintiff Carusi was consistently assigned (5) or more shifts per workweek.

153.    On or around November 9, 2015, Plaintiff Carusi opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

154.    Defendant had actual knowledge that Plaintiff Carusi opted-in to the Lawsuit.

155.    Subsequently, Defendant's PPA Supervisors stated to Plaintiff Carusi that PPAs who were involved in the Lawsuit and the PPA Lawsuits would no longer be assigned shifts.

156.    After Defendant learned that Plaintiff Carusi opted-in to Lawsuit, Defendant ceased assigning him shifts of work and he was terminated in retaliation for opting-in to the Lawsuit.

157.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Carusi was refused employment. Furthermore, Plaintiff Carusi sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

158.    Prior to opting-in to the Lawsuit, Plaintiff Carusi was routinely hired as a PPA for Defendant's productions.

159.    Accordingly, Defendant refused to hire Plaintiff Carusi in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**VII.    Facts Specific to Plaintiff Sajjad**

160.    Plaintiff Sajjad has at all relevant times been an employee pursuant to the FLSA and the NYLL.

161.    Plaintiff Sajjad was formerly employed by Defendant as a PPA.

162.    While employed by Defendant, Plaintiff Sajjad was consistently assigned (5) or more shifts per workweek.

163.    On or around July 12, 2016, Plaintiff Sajjad opted-in to the Lawsuit by filing her consent to become a party plaintiff under the FLSA.

164.    Defendant had actual knowledge that Plaintiff Sajjad opted-in to the Lawsuit.

165.    Subsequently, Defendant's Supervisor telephoned Plaintiff Sajjad to inquire whether she was involved in the Lawsuit and the PPA Lawsuits. When Plaintiff Sajjad, in fear of losing her job, denied her participation, the Supervisor responded that Mr. Cabrera was going to find out who was involved.

166.     After Defendant learned that Plaintiff Sajjad opted-in to the Lawsuit, Defendant ceased assigning her shifts of work and she was terminated in retaliation for opting-in to the Lawsuit.

167.     On numerous occasions in 2016 and after October 1, 2016, Plaintiff Sajjad was refused employment. Furthermore, Plaintiff Sajjad sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

168.     Prior to opting-in to the Lawsuit, Plaintiff Sajjad was routinely hired as a PPA for Defendant's productions.

169.     Accordingly, Defendant refused to hire Plaintiff Sajjad in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**VIII.   Facts Specific to Plaintiff Fermin**

170.     Plaintiff Fermin has at all relevant times been an employee pursuant to the FLSA and the NYLL.

171.     Plaintiff Fermin was formerly employed by Defendant as a PPA.

172.     While employed by Defendant, Plaintiff Fermin was consistently assigned (5) or more shifts per workweek.

173.     Plaintiff Fermin was a named plaintiff in the Lawsuit.

174.     Plaintiff Fermin filed the Lawsuit on October 8, 2015.

175.     Defendant had actual knowledge that Plaintiff Fermin commenced the Lawsuit.

176.     After Defendant learned that Plaintiff Fermin commenced the Lawsuit, Defendant ceased assigning him shifts of work and he was terminated in retaliation for filing the Lawsuit.

177.    After Defendant learned that Plaintiff Fermin commenced the Lawsuit, a Supervisor stated to Plaintiff Fermin: "why the fuck did you start the Lawsuit."

178.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Fermin was refused employment. Furthermore, Plaintiff Fermin sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

179.    Prior to filing the Lawsuit, Plaintiff Fermin was routinely hired as a PPA for Defendant's productions.

180.    Accordingly, Defendant refused to hire Plaintiff Fermin in retaliation for filing the Lawsuit in violation of the FLSA and the NYLL.

### IX.    Facts Specific to Plaintiff Tracey

181.    Plaintiff Tracey has at all relevant times been an employee pursuant to the FLSA and the NYLL.

182.    Plaintiff Tracey was formerly employed by Defendant as a PPA.

183.    While employed by Defendant, Plaintiff Tracey was consistently assigned (5) or more shifts per workweek.

184.    On or around November 6, 2015, Plaintiff Tracey opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

185.    Defendant had actual knowledge that Plaintiff Tracey opted-in to the Lawsuit.

186.    Subsequently, Plaintiff Tracey participated in a New York Times interview to discuss the Lawsuit and the PPA Lawsuits.

187.    Upon information and belief, after the interview was published, Defendant's Parking Coordinators and/or PPA Supervisors used the article to deter other production companies

from hiring Plaintiff Tracey as a PPA by showing the article to other Parking Coordinators and telling them not to hire or employ Plaintiff Tracey.

188.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Tracey shifts of work and he was terminated in retaliation for opting-in to the Lawsuit.

189.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Tracey was refused employment. Furthermore, Plaintiff Tracey sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

190.    Prior to opting-in to the Lawsuit, Plaintiff Tracey was routinely hired as a PPA for Defendant's productions.

191.    Accordingly, Defendant refused to hire Plaintiff Tracey in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**X.    Facts Specific to Plaintiff Campbell**

192.    Plaintiff Campbell has at all relevant times been an employee pursuant to the FLSA and the NYLL.

193.    Plaintiff Campbell was formerly employed by Defendant as a PPA.

194.    While employed by Defendant, Plaintiff Campbell was consistently assigned (5) or more shifts per workweek.

195.    On or around November 11, 2015, Plaintiff Campbell opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

196.    Defendant had actual knowledge that Plaintiff Campbell opted-in to the Lawsuit.

197.    Subsequently, Plaintiff Campbell participated in a New York Times interview to discuss the Lawsuit and the PPA Lawsuits.

198.     Upon information and belief, after the interview was published, Defendant's Parking Coordinators and/or PPA Supervisors used the article to deter other production companies from hiring Plaintiff Campbell as a PPA by showing the article to other Parking Coordinators and telling them not to hire or employ Plaintiff Campbell.

199.     Shortly after opting-in to the lawsuit, Defendant ceased assigning Plaintiff Campbell shifts of work and he was terminated in retaliation for opting-in to the Lawsuit.

200.     On numerous occasions in 2016 and after October 1, 2016, Plaintiff Campbell was refused employment. Furthermore, Plaintiff Campbell sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

201.     Prior to opting-in to the Lawsuit, Plaintiff Campbell was routinely hired as a PPA for Defendant's productions.

202.     Accordingly, Defendant refused to hire Plaintiff Campbell in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**XI.     Facts Specific to Plaintiff Bailey**

203.     Plaintiff Bailey has at all relevant times been an employee pursuant to the FLSA and the NYLL.

204.     Plaintiff Bailey was formerly employed by Defendant as a PPA.

205.     While employed by Defendant, Plaintiff Bailey was consistently assigned (5) or more shifts per workweek.

206.     On or around December 21, 2015, Plaintiff Bailey opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

207.     Defendant had actual knowledge that Plaintiff Bailey opted-in to the Lawsuit.

208.   Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Bailey any shifts to work shifts of work and she was terminated in retaliation for opting-in to the Lawsuit.

209.   On numerous occasions in 2016 and after October 1, 2016, Plaintiff Bailey was refused employment. Furthermore, Plaintiff Bailey sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

210.   Prior to opting-in to the Lawsuit, Plaintiff Bailey was routinely hired as a PPA for Defendant's productions.

211.   Accordingly, Defendant refused to hire Plaintiff Bailey in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**XII.   Facts Specific to Plaintiff Barnes**

212.   Plaintiff Barnes has at all relevant times been an employee pursuant to the FLSA and the NYLL.

213.   Plaintiff Barnes was formerly employed by Defendant as a PPA.

214.   While employed by Defendant, Plaintiff Barnes was consistently assigned (5) or more shifts per workweek.

215.   On or around December 8, 2015, Plaintiff Barnes opted-in to the Lawsuit by filing her consent to become a party plaintiff under the FLSA.

216.   Defendant had actual knowledge that Plaintiff Barnes opted-in to the Lawsuit.

217.   On one occasion, one of Mr. Cabrera's Supervisors telephoned Ms. Barnes to inquire whether she was involved in the Lawsuit and the PPA Lawsuits.

218.   Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Barnes any shifts to work shifts of work and she was terminated in retaliation for opting-in to the Lawsuit.

28

219.    Another PPA Supervisor told Plaintiff Barnes that the reason why she was no longer getting shifts was because she was a participant in the Lawsuit and the PPA Lawsuits.

220.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Barnes was refused employment. Furthermore, Plaintiff Barnes sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

221.    Prior to opting-in to the Lawsuit, Plaintiff Barnes was routinely hired as a PPA for Defendant's productions.

222.    Accordingly, Defendant refused to hire Plaintiff Barnes in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**XIII.    Facts Specific to Plaintiff Bennett**

223.    Plaintiff Bennett has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

224.    Plaintiff Bennett was formerly employed by Defendant as a PPA.

225.    While employed by Defendant, Plaintiff Bennett was consistently assigned (5) or more shifts per workweek.

226.    On or around February 11, 2016, Plaintiff Bennett opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

227.    Defendant had actual knowledge that Plaintiff Bennett opted-in to the Lawsuit.

228.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Bennett any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

229.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Bennett was refused employment. Furthermore, Plaintiff Bennett sought employment as a PPA through

Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

230.    Prior to opting-in to the Lawsuit, Plaintiff Bennett was routinely hired as a PPA for Defendant's productions.

231.    Accordingly, Defendant refused to hire Plaintiff Bennett in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**XIV.   Facts Specific to Plaintiff Birkbeck**

232.    Plaintiff Birkbeck has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

233.    Plaintiff Birkbeck was formerly employed by Defendant as a PPA.

234.    While employed by Defendant, Plaintiff Birkbeck was consistently assigned (5) or more shifts per workweek.

235.    On or around November 11, 2015, Plaintiff Birkbeck opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

236.    Defendant had actual knowledge that Plaintiff Birkbeck opted-in to the Lawsuit.

237.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Birkbeck any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

238.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Birkbeck was refused employment. Furthermore, Plaintiff Birkbeck sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

239.    Prior to opting-in to the Lawsuit, Plaintiff Birkbeck was routinely hired as a PPA for Defendant's productions.

240.     Accordingly, Defendant refused to hire Plaintiff Birkbeck in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**XV.     Facts Specific to Plaintiff Blackwood**

241.     Plaintiff Blackwood has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

242.     Plaintiff Blackwood was employed by Defendant as a PPA.

243.     While employed by Defendant, Plaintiff Blackwood was consistently assigned (5) or more shifts per workweek.

244.     On or around July 12, 2016, Plaintiff Blackwood opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

245.     Defendant had actual knowledge that Plaintiff Blackwood opted-in to the Lawsuit.

246.     Shortly after opting-in to the Lawsuit, Plaintiff Blackwood's weekly allotted shifts were reduced in retaliation for opting-in to the Lawsuit.

247.     Both before and after October 1, 2016, Plaintiff Blackwood requested more shifts to work from Defendant, but these requests were ignored and denied.

248.     Prior to opting-in to the Lawsuit, Plaintiff Blackwood was routinely hired as a PPA for Defendant's productions.

249.     Accordingly, Defendant reduced Plaintiff Blackwood's allotted shifts reduced in retaliation for opting-in to the Lawsuit.

**XVI.   Facts Specific to Plaintiff Brazel**

250.     Plaintiff Brazel has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

251.     Plaintiff Brazel was formerly employed by Defendant as a PPA.

31

252.    While employed by Defendant, Plaintiff Brazel was consistently assigned (5) or more shifts per workweek.

253.    On or around April 15, 2016, Plaintiff Brazel opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

254.    Defendant had actual knowledge that Plaintiff Brazel opted-in to the Lawsuit.

255.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Brazel any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

256.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Brazel was refused employment. Furthermore, Plaintiff Brazel sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

257.    Prior to opting-in to the Lawsuit, Plaintiff Brazel was routinely hired as a PPA for Defendant's productions.

258.    Accordingly, Defendant refused to hire Plaintiff Brazel in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**XVII.  Facts Specific to Plaintiff Brown**

259.    Plaintiff Brown has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

260.    Plaintiff Brown was formerly employed by Defendant as a PPA.

261.    While employed by Defendant, Plaintiff Brown was consistently assigned (5) or more shifts per workweek.

262.    On or around April 22, 2016, Plaintiff Brown opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

263.    Defendant had actual knowledge that Plaintiff Brown opted-in to the Lawsuit.

264.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Brown any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

265.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Brown was refused employment. Furthermore, Plaintiff Brown sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

266.    Prior to opting-in to the Lawsuit, Plaintiff Brown was routinely hired as a PPA for Defendant's productions.

267.    Accordingly, Defendant refused to hire Plaintiff Brown in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**XVIII. Facts Specific to Plaintiff Chambers**

268.    Plaintiff Chambers has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

269.    Plaintiff Chambers was formerly employed by Defendant as a PPA.

270.    While employed by Defendant, Plaintiff Chambers was consistently assigned (5) or more shifts per workweek.

271.    In or around September 2014, Plaintiff Chambers ceased working as a PPA.

272.    On or around November 2, 2015, Plaintiff Chambers opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

273.    Defendant had actual knowledge that Plaintiff Chambers opted-in to the Lawsuit.

274.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Chambers any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

275.     On numerous occasions in 2016 and after October 1, 2016, Plaintiff Chambers was refused employment. Furthermore, Plaintiff Chambers sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

276.     Accordingly, Defendant refused to hire Plaintiff Chambers in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

277.     Prior to opting-in to the Lawsuit, Plaintiff Chambers was routinely hired as a PPA for Defendant's productions.

278.     Accordingly, Defendant's refused to rehire Plaintiff Chambers in retaliation for opting-in to the lawsuit.

## XIX.   Facts Specific to Plaintiff Dhanasar

279.     Plaintiff Dhanasar has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

280.     Plaintiff Dhanasar was employed by Defendant as a PPA.

281.     While employed by Defendant, Plaintiff Dhanasar was consistently assigned (5) or more shifts per workweek.

282.     On or around April 22, 2016, Plaintiff Dhanasar opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

283.     Defendant had actual knowledge that Plaintiff Dhanasar opted-in to the Lawsuit.

284.     Shortly after opting-in to the Lawsuit, Plaintiff Dhanasar's weekly allotted shifts were reduced in retaliation for opting-in to the Lawsuit.

285.     Both before and after October 1, 2016, Plaintiff Dhanasar requested more shifts to work from Defendant, but these requests were ignored and denied.

286.    Accordingly, Defendant reduced Plaintiff Dhanasar's allotted shifts reduced in retaliation for opting-in to the Lawsuit in violation of the FLSA and the NYLL.

## XX.    Facts Specific to Plaintiff F. Diaz

287.    Plaintiff F. Diaz has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

288.    Plaintiff F. Diaz was formerly employed by Defendant as a PPA.

289.    While employed by Defendant, Plaintiff F. Diaz was consistently assigned (5) or more shifts per workweek.

290.    On or around November 20, 2015, Plaintiff F. Diaz opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

291.    Defendant had actual knowledge that Plaintiff F. Diaz opted-in to the Lawsuit.

292.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff F. Diaz any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

293.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff F. Diaz was refused employment. Furthermore, Plaintiff F. Diaz sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

294.    Prior to opting-in to the Lawsuit, Plaintiff F. Diaz was routinely hired as a PPA for Defendant's productions.

295.    Accordingly, Defendant refused to hire Plaintiff F. Diaz in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

### XXI. Facts Specific to Plaintiff R. Diaz

296. Plaintiff R. Diaz has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

297. Plaintiff R. Diaz was formerly employed by Defendant as a PPA.

298. While employed by Defendant, Plaintiff R. Diaz was consistently assigned (5) or more shifts per workweek.

299. On or around November 20, 2015, Plaintiff R. Diaz opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

300. Defendant had actual knowledge that Plaintiff R. Diaz opted-in to the Lawsuit.

301. Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff R. Diaz any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

302. On numerous occasions in 2016 and after October 1, 2016, Plaintiff R. Diaz was refused employment. Furthermore, Plaintiff R. Diaz sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

303. Prior to opting-in to the Lawsuit, Plaintiff R. Diaz was routinely hired as a PPA for Defendant's productions.

304. Accordingly, Defendant refused to hire Plaintiff R. Diaz in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

### XXII. Facts Specific to Plaintiff Harrison

305. Plaintiff Harrison has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

306. Plaintiff Harrison was formerly employed by Defendant as a PPA.

307.    While employed by Defendant, Plaintiff Harrison was consistently assigned (5) or more shifts per workweek.

308.    On or around May 4, 2016, Plaintiff Harrison opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

309.    Defendant had actual knowledge that Plaintiff Harrison opted-in to the Lawsuit.

310.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Harrison any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

311.    Plaintiff Harrison received a telephone call from an unknown caller who told Plaintiff Harrison not to participate in the Lawsuit and the PPA Lawsuits. The unknown caller also stated that he "would find out" if Plaintiff Harrison did participate.

312.    Upon information and belief, the unknown caller referred to in the immediately preceding paragraph was a Parking Coordinator or a PPA Supervisor.

313.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Harrison was refused employment. Furthermore, Plaintiff Harrison sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

314.    Prior to opting-in to the Lawsuit, Plaintiff Harrison was routinely hired as a PPA for Defendant's productions.

315.    Accordingly, Defendant refused to hire Plaintiff Harrison in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL

## XXIII. Facts Specific to Plaintiff Jackson

316.    Plaintiff Jackson has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

317.     Plaintiff Jackson was formerly employed by Defendant as a PPA.

318.     While employed by Defendant, Plaintiff Jackson was consistently assigned (5) or more shifts per workweek.

319.     On or around November 9, 2015, Plaintiff Jackson opted-in to the Lawsuit by filing her consent to become a party plaintiff under the FLSA.

320.     Defendant had actual knowledge that Plaintiff Jackson opted-in to the Lawsuit.

321.     Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Jackson any shifts to work and she was terminated in retaliation for opting-in to the Lawsuit.

322.     On numerous occasions in 2016 and after October 1, 2016, Plaintiff Jackson was refused employment. Furthermore, Plaintiff Jackson sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

323.     Prior to opting-in to the Lawsuit, Plaintiff Jackson was routinely hired as a PPA for Defendant's productions.

324.     Accordingly, Defendant refused to hire Plaintiff Jackson in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL

**XXIV. Facts Specific to Plaintiff Morel**

325.     Plaintiff Morel has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

326.     Plaintiff Morel was formerly employed by Defendant as a PPA.

327.     While employed by Defendant, Plaintiff Morel was consistently assigned (5) or more shifts per workweek.

328.   On or around November 11, 2015, Plaintiff Morel opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

329.   Defendant had actual knowledge that Plaintiff Morel opted-in to the Lawsuit.

330.   Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Morel any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

331.   On numerous occasions in 2016 and after October 1, 2016, Plaintiff Morel was refused employment. Furthermore, Plaintiff Morel sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

332.   Prior to opting-in to the Lawsuit, Plaintiff Morel was routinely hired as a PPA for Defendant's productions.

333.   Accordingly, Defendant refused to hire Plaintiff Morel in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL

**XXV.   Facts Specific to Plaintiff Morgan**

334.   Plaintiff Morgan has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

335.   Plaintiff Morgan was formerly employed by Defendant as a PPA.

336.   While employed by Defendant, Plaintiff Morgan was consistently assigned (5) or more shifts per workweek.

337.   On or around October 26, 2015, Plaintiff Morgan opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

338.   Defendant had actual knowledge that Plaintiff Morgan opted-in to the Lawsuit.

339.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Morgan any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

340.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Morgan was refused employment. Furthermore, Plaintiff Morgan sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

341.    Prior to opting-in to the Lawsuit, Plaintiff Morgan was routinely hired as a PPA for Defendant's productions.

342.    Accordingly, Defendant refused to hire Plaintiff Morgan in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL

## XXVI. Facts Specific to Plaintiff Muhammed

343.    Plaintiff Muhammed has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

344.    Plaintiff Muhammed was formerly employed by Defendant as a PPA.

345.    While employed by Defendant, Plaintiff Muhammed was consistently assigned (5) or more shifts per workweek.

346.    On or around November 24, 2015, Plaintiff Muhammed's opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

347.    Defendant had actual knowledge that Plaintiff Muhammed opted-in to the Lawsuit.

348.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Muhammed any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

349.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Muhammed was refused employment. Furthermore, Plaintiff Muhammed sought employment as a PPA

through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

350.    Prior to opting-in to the Lawsuit, Plaintiff Muhammed was routinely hired as a PPA for Defendant's productions.

351.    Accordingly, Defendant refused to hire Plaintiff Muhammed in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**XXVII.    Facts Specific to Plaintiff Phifer**

352.    Plaintiff Phifer has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

353.    Plaintiff Phifer was formerly employed by Defendant as a PPA.

354.    While employed by Defendant, Plaintiff Phifer was consistently assigned (5) or more shifts per workweek.

355.    On or around November 04, 2015, Plaintiff Phifer opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

356.    Defendant had actual knowledge that Plaintiff Phifer opted-in to the Lawsuit.

357.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Phifer any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

358.    On one occasion, Mr. Cabrera threatened Plaintiff Phifer's life by stating that if he opts into the Lawsuit and the PPA Lawsuits he would be killed.

359.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Phifer was refused employment. Furthermore, Plaintiff Phifer sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

360.     Prior to opting-in to the Lawsuit, Plaintiff Phifer was routinely hired as a PPA for Defendant's productions.

361.     Accordingly, Defendant refused to hire Plaintiff Phifer in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**XXVIII.   Facts Specific to Plaintiff Rasullah**

362.     Plaintiff Rasullah has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

363.     Plaintiff Rasullah was employed by Defendant as a PPA.

364.     While employed by Defendant, Plaintiff Rasullah was consistently assigned (5) or more shifts per workweek.

365.     On or around October 30, 2015, Plaintiff Rasullah opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

366.     Defendant had actual knowledge that Plaintiff Rasullah opted-in to the Lawsuit.

367.     Shortly after opting-in to the Lawsuit, Plaintiff Rasullah's weekly allotted shifts were reduced in retaliation for opting-in to the Lawsuit.

368.     Before and after October 1, 2016, Plaintiff Rasullah requested more shifts to work from Defendant, but these requests were ignored and denied.

369.     Defendant reduced Plaintiff Rasullah's allotted shifts reduced in retaliation for opting-in to the Lawsuit in violation of the FLSA and the NYLL.

**XXIX. Facts Specific to Plaintiff Spence**

370.     Plaintiff Spence has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

371.     Plaintiff Spence was formerly employed by Defendant as a PPA.

372.    While employed by Defendant, Plaintiff Spence was consistently assigned (5) or more shifts per workweek.

373.    On or around November 9, 2015, Plaintiff Spence opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

374.    Defendant had actual knowledge that Plaintiff Spence opted-in to the Lawsuit.

375.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Spence any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

376.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Spence was refused employment. Furthermore, Plaintiff Spence sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

377.    Prior to opting-in to the Lawsuit, Plaintiff Spence was routinely hired as a PPA for Defendant's productions.

378.    Accordingly, Defendant refused to hire Plaintiff Spence in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL

**XXX.  Facts Specific to Plaintiff Taylor**

379.    Plaintiff Taylor has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

380.    Plaintiff Taylor was formerly employed by Defendant as a PPA.

381.    While employed by Defendant, Plaintiff Taylor was consistently assigned (5) or more shifts per workweek.

382.    On or around June 28, 2016, Plaintiff Taylor opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

383.    Defendant had actual knowledge that Plaintiff Taylor opted-in to the Lawsuit.

384.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Taylor any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

385.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Taylor was refused employment. Furthermore, Plaintiff Taylor sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

386.    Prior to opting-in to the Lawsuit, Plaintiff Taylor was routinely hired as a PPA for Defendant's productions.

387.    Accordingly, Defendant refused to hire Plaintiff Taylor in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

**XXXI. Facts Specific to Plaintiff Wilson**

388.    Plaintiff Wilson has at all relevant times been an "employee" pursuant to the FLSA and the NYLL.

389.    Plaintiff Wilson was formerly employed by Defendant as a PPA.

390.    While employed by Defendant, Plaintiff Wilson was consistently assigned (5) or more shifts per workweek.

391.    On or around November 2, 2015, Plaintiff Wilson opted-in to the Lawsuit by filing his consent to become a party plaintiff under the FLSA.

392.    Defendant had actual knowledge that Plaintiff Wilson opted-in to the Lawsuit.

393.    Shortly after opting-in to the Lawsuit, Defendant ceased assigning Plaintiff Wilson any shifts to work and he was terminated in retaliation for opting-in to the Lawsuit.

394.    On numerous occasions in 2016 and after October 1, 2016, Plaintiff Wilson was refused employment. Furthermore, Plaintiff Wilson sought employment as a PPA through Defendant's informal hiring process at various times from 2016 to the present, but these requests were expressly denied or were ignored.

395.    Prior to opting-in to the Lawsuit, Plaintiff Wilson was routinely hired as a PPA for Defendant's productions.

396.    Accordingly, Defendant refused to hire Plaintiff Wilson in retaliation for opting-in to the Lawsuit and for refusing to opt-out of it in violation of the FLSA and the NYLL.

### CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION FOR A VIOLATION OF
The Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*

397.    Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

398.    Plaintiffs engaged in a protected activity by participating in the Lawsuit as named and opt-in plaintiffs.

399.    The Lawsuit alleged that Defendant violated the FLSA by, among other things, willfully failing to pay Plaintiffs the overtime premium for all hours worked in excess of forty (40) hours per workweek.

400.    In direct retaliation for Plaintiffs engaging in protected activity, Defendant refused to hire Plaintiffs and/or reduced Plaintiffs' shifts per workweek after October 1, 2016.

401.    Defendant's conduct was in violation of the Fair Labor Standards Act, as amended 29 U.S.C. §§ 201 *et seq.*

## AS AND FOR A SECOND CAUSE OF ACTION FOR A VIOLATION OF
### The New York Labor Law

402.   Plaintiffs re-allege and incorporate by reference all allegations in all preceding paragraphs.

403.   Plaintiffs engaged in a protected activity by participating in the Lawsuit as named and opt-in plaintiffs and as Fed. R Civ. P. 23 class members.

404.   The Lawsuit alleged that Defendant violated the NYLL by, among other things, willfully failing to pay Plaintiffs the overtime premium for all hours worked in excess of forty (40) hours per workweek.

405.   In direct retaliation for Plaintiffs engaging in protected activity, Defendant refused to hire Plaintiffs and/or reduced Plaintiffs' shifts per workweek after October 1, 2016.

406.   Defendant's conduct was in violation of the New York Labor Law

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendant as follows:

A.   Preliminary and permanent injunctions against Defendant and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

B.   A judgment declaring that the practices complained of herein are unlawful and in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* and the New York Labor Law.

C.   All damages which Plaintiffs have sustained as a result of Defendant's conduct, including back pay, liquidated damages, general and special damages for lost compensation and job benefits they would have received but for Defendant's improper practices;

D.      Awarding Plaintiffs pre-judgment interest at the highest level rate, from and after the date of service of the initial complaint in this action on all unpaid wages from the date such wages were earned and due;

E.      Awarding Plaintiffs Defendant's share of FICA, FUTA, state unemployment insurance, and any other required employment taxes;

F.      Awarding Plaintiffs for the amount of unpaid wages, including interest thereon, and penalties, including liquidated damages subject to proof;

G.      Awarding Plaintiffs their costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees, and other costs;

H.      Pre-judgment and post-judgment interest, as provided by law;

I.      Fully reinstating all Plaintiffs; and

J.      Granting Plaintiffs other and further relief as this Court finds necessary and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by this complaint and to determine liability and damages. Dated:   April 9, 2019
          Garden City, New York

Respectfully submitted,

*/s/ James A. Vagnini*
James A. Vagnini, Esq.
Matthew L. Berman, Esq.
Alexander M. White, Esq.
**Valli Kane & Vagnini LLP**
600 Old Country Road, Suite 519
Garden City, New York 11530
(516) 203-7180 (phone)
(516) 706-0248 (fax)

**ATTORNEYS FOR PLAINTIFFS**